WALKER, et al. *v.* POLK, et al.

In Banc.   Feb. 13, 1950.

No. 37271 (44 So. (2d) 477)

**Williams & Williams,** for appellants.

W. B. Wagner, Murray Christian, C. W. Sullivan, Wall & Allen, Wells, Wells, Newman & Thomas, L. O. Smith, Jr., for appellees.

McGehee, C. J.

This suit seeks to have quieted and confirmed the title of 40 acres of land on account of the disturbing effect had thereon by the renewed interest of the respective claimants because of the production of oil and gas in close proximity to such land. The suit was filed on June 12, 1945, by the appellee R. E. L. Polk, purchaser of the land at a tax sale, made on April 7, 1930. The other

appellees, Superior Oil Company and M. E. Perry, who claim through Mr. Polk under an oil and gas lease and a mineral deed respectively, were allowed to intervene as complainants. The appeal is from a final decree in favor of said tax title purchaser and the other complainants, which granted the relief prayed for against the defendants, Levi Walker and the other surviving children of Celia Walker, deceased, who obtained a United States patent to the land on September 1, 1910, and who owned the land at the time of the tax sale and resided thereon and cultivated the greater portion thereof until shortly before the year of the tax sale, when she moved to St. Louis, Missouri, after her dwelling and other improvements had been destroyed by fire.

It appears that the defendant Levi Walker had charge of the land shortly after his mother and the other children had moved away, and that it was for that reason assessed to him for the years 1928 to 1931, inclusive, during all of which time he paid the taxes every year, except those for 1928 which were paid for him by ''Rawls & Lampton'', unless there was a failure in 1930 to pay the taxes thereon for the year 1929, as contended by appellees, before the hour of sale on April 7, 1930.

It seems that in 1934, Levi Walker also moved away, and there was some testimony at the trial to the effect that in the year 1935 the land was left under the control of one Rich Gray, who had married a daughter of Celia Walker, but who predeceased her mother, and that Gray was then residing on nearby land. However, Rich Gray neither made any use of the land nor paid any taxes thereon, but he granted permission to some of the persons to whom the tax title purchaser had rented it after 1935, agreeing that they might go ahead and cultivate certain small patches of the open land, near the edges of the 40 acres. The proof discloses that these small patches, consisting of approximately 4 acres, were cultivated for 4 years by Louis and Lefty Gray, Jr., beginning in 1935. They were later succeeded by A. L. Dampeer, and he

was succeeded by Charlie Thompson, and the latter was succeeded by Givens Draughn, and after which time Louis Gray began to again make some use of the land, all as tenants of the tax title purchaser, but three of whom also obtained the consent of Rich Gray as aforesaid to 'use the land without compensation to him therefor, they paying to Mr. Polk one-fourth of whatever agricultural products were produced.

The complainants therefore sought to have their title quieted and confirmed on two grounds, first, the alleged validity of the tax sale to the complainant R. E. L. Polk, of April 7, 1930, and second, actual adverse possession claimed to have been uninterruptedly continued for ten years, such as to vest in them a full and complete title under Sections 709 and 711, Code of 1942. The trial court sustained the bill of complaint, quieted and confirmed the title of complainants, and cancelled the claim of the defendants thereto as a cloud upon the alleged true title.

If the complainant R. E. L. Polk acquired a valid title at the tax sale of April 7, 1930, it would not be necessary for us to determine the sufficiency of the evidence as to whether or not the adverse possession relied on by him was continuous for a period of ten consecutive years; otherwise, it will become necessary that we discuss and pass on the sufficiency of such evidence.

The validity of the tax sale in question depends upon the interpretation and effect to be given the evidence, both oral and documentary, on the primary issue as to whether all taxes legally levied against the land for the year 1929 were paid by Levi Walker at any time in 1930 prior to the sale of the land for taxes on April 7, 1930.

The burden of proof was on the appellees, as complainants, seeking to have the tax title quieted and confirmed, to prove not only a valid assessment of the land was for taxes, but that the taxes for which the land was offered for sale had not been paid. To that end they introduced the tax deed to the complainant Polk and the

duplicate of a tax receipt, dated April 7, 1930, reciting that the taxes in the sum of $14.82, for the year 1929, had been received from Levi Walker on this land (correctly describing it), and the receipt was signed "V. L. Terrell, Sheriff and Tax Collector", but which duplicate tax receipt also contained a notation in the blank space between the description of the land and the signature of the sheriff and tax collector to the receipt as follows: "Sold to R. E. L. Polk", and a further notation in such space "Sold, R. E. L. Polk $19.83". This duplicate tax receipt, a photostatic copy of which is made a part of the record, is dated "4-7-1930", the "19" being printed, and the "30" being written, with the same pencil as were the words contained in the first notation hereinbefore mentioned, "Sold to R. E. L. Polk", and with a different pencil than the second notation, or the name "Levi Walker", the description of the land, and the name "V. L. Terrell" were written. Of course, this would be true for the reason that such notations were made on a different occasion, subsequent to the purported tax sale and after the tax receipt had been duly issued and signed.

However, Section 6956, Hemingway's Code of 1917 (Section 8241, Hemingway's Code of 1927), which was then in force, requires that a tax receipt shall be given to everyone paying taxes, and that the same be dated, numbered, and filled up so as to show by whom and on what taxes were paid, and, in case of land, distinctly specifying it as it is described on the assessment roll; that any other receipt shall not be valid as evidence; and that the duplicate of the receipt, numbered and filled up so as to be an exact copy of it, shall be left in its place in the Book of Receipts. This duplicate tax receipt, as introduced in evidence by the complainants, recited on its face, omitting the two quoted notations contained in the blank space between the description and the signature of the sheriff and tax collector, the following:

"Sheriff's Office, Jefferson Davis County, Miss.

"No. 4973

"4-7-1930

"Received of Levi Walker     $14.82

   "State and County Taxes for the fiscal year 1929, as per following statements and descriptions of real and personal property, to-wit.

"Total Real Assessment...... $———

"Total Personal Assessment.. $———

       "Total   $——— Rate per cent 57

| "Division of Section | S | T | R | Valuation |
|---|---|---|---|---|
| "SE   N   W | 28 | 4 | 18 | 260 |

| | Dollars | Cts. |
|---|---|---|
| "——— Tax ——— | 14 | 82 |

"Dog Tax ———

"Poll Tax ———

     4

"District  ———

"Clem (meaning to include Clem Consolidated School)

"School  ———

"Total      14      82

       "V. L. Terrell /s/

       "Sheriff and Tax Collector,

       "Jefferson Davis County.

       "By ——————— D. S."

The record is silent as to what became of the original tax receipt, but on the cross-examination of the defendant Levi Walker, he was asked the following questions and gave the answers below shown:

"Q. You did not personally pay the taxes on this forty acres in 1930 and 1931, did you? A. In 1930.

"Q. Did you pay the taxes on April 6, 1931, for the 1930 taxes? A. I paid them myself.

"Q. Did you personally pay them? A. I paid them myself.

"Q. Did you come up here in 1932 and pay the 1931 taxes? A. I paid the taxes two years myself. In 1930

I borrowed some money from Mr. Polk and came down here and paid the taxes down here.''

The statement of the said Levi Walker contained in the last answer above given when he said, ''In 1930 I borrowed some money from Mr. Polk and came down here and paid the taxes down here'' was not disputed by the testimony of the defendant R. E. L. Polk, assuming that he was the person to whom the witness referred in said answer, and he was never asked whether or not Levi Walker did in fact borrow some money from him in 1930, with which to pay such taxes. He was asked whether or not at the time he purchased at the tax sale on April 7, 1930, he had any arrangements with Levi Walker, Ella W. McInnis, or Frank Jones, the three defendants in the case, ''to purchase their land for their benefit''. And he replied, ''No.'' He was again asked further on in his testimony: ''Q. What agreement had been made by them at the time of the tax sale, or before, for you to purchase the land for their benefit? A. None.'' However, the testimony on behalf of the defendants was not that Mr. Polk agreed *to purchase the land at the sale for their benefit,* but that Levi Walker borrowed some money from him in 1930 and paid the taxes himself.

The Sheriff and Tax Collector, V. L. Terrell, was not introduced as a witness to show whether or not it was his practice and custom to do the imprudent thing of signing a tax receipt in his tax receipt book before he was ready to deliver the original to the taxpayer, contemporaneously with the receipt of the tax money represented by such receipt.

If it was his practice and custom to fill out the tax receipt in full, with the exception of the date and his signature thereto, in advance of the time when the taxpayer called at his office to pay the taxes, it would follow that when he signed a receipt reciting the payment of the taxes he would thereupon deliver the original tax receipt to the taxpayer. In such event, he would then be without authority to either sell the land or to write on

the duplicate tax receipt, left as an official record in his book, any notation to the effect that the land was sold to some other person for the taxes for the year mentioned in such receipt. There can be no valid tax sale except for the nonpayment of taxes.

The situation presented in the instant case could have been clarified by the testimony of the Sheriff and Tax Collector, showing whether by oversight he failed to mark this land off of the newspaper list of those advertised for sale and then proceeded through mistake to sell the same to the complainant R. E. L. Polk, or whether it was his practice or custom to fill out and *sign* the tax receipts, leaving both the original and the duplicate in the book, even though the taxes had not been paid. If the original tax receipt had not been delivered to Levi Walker at the time the duplicate was signed, or if it had been destroyed by the Tax Collector or delivered to the tax title purchaser at the time the notations ''sold to R. E. L. Polk'' were entered on the duplicate, it would seem that either the Tax Collector or Mr. Polk could have furnished some explanation as to what became of the original receipt.

If it be contended that Levi Walker should have produced the original himself at the trial in support of his claim that he paid any taxes on the land in 1930, which would have necessarily been for the year 1929, the receipts for the taxes for 1928, 1930, and 1931, being introduced and dated in April, 1929, 1931, and 1932, it is shown that he does not appear to have been in possession of the original tax receipts for the years during which he had admittedly paid the taxes, but relied upon the introduction of the duplicate tax receipts as proof of such payment by him for these other years, the same as for 1929.

In support of the contention of the complainants that the taxes for 1929 were not paid, they not only offered in evidence a tax deed from the Sheriff and Tax Collector, dated and filed April 8, 1930, and which was filed for record two years later, although not actually recorded

in the land deed records until May 9, 1940, the year during which the land was leased for oil and gas by the tax title purchaser, but they also introduced the assessment roll and the Sheriff and Tax Collector's copy of the list of lands sold for taxes on April 7, 1930, and the copy thereof filed with the Chancery Clerk, and which roll and lists of course disclosed that this land was assessed to Levi Walker and sold to R. E. L. Polk on April 7, 1930, and that reference thereon was made to tax receipt 4973, hereinbefore quoted, because this list of the lands sold for taxes was made up after the purported sale, and presumably after the notations had been made on the duplicate tax receipt.

As to it being improbable that the tax collector would have sold this land to the complainant R. E. L. Polk if he had already collected the taxes thereon from Levi Walker it is found that on April 1st of the previous year he sold this same land to ''Lampton and Rawls'' and executed to the said firm or corporation a tax deed therefor on April 2nd, 1929, at a time when the duplicate tax receipt in his office made out in favor of Levi Walker, and duly signed, disclosed on the face thereof that the taxes in the sum of $19.94 were ''paid by Rawls and Lampton''. And above said notation there appears the following: ''Dam.—$5.43'' and immediately under the above quotation there appears the figures ''25.39'', and then all of this is crossed out, so as to leave the receipt showing that the $19.94 taxes due were paid by Rawls and Lampton, and it appears from the testimony that the Lampton and Rawls Company then held a chattel deed of trust which had been executed by Levi Walker and he testified that they had agreed to pay the taxes for him. A quitclaim deed was obtained from the Lampton and Rawls Company in favor of the complainant R. E. L. Polk for this land after this suit was filed, and for the reason that the said Company held the tax deed of April 2, 1929, showing that it had purchased the land for the 1928 taxes as hereinbefore stated, notwithstanding that the records dis-

closed payment of the taxes by said company for the owner.

We do not know whether or not the testimony of Levi Walker is true when he said, "In 1930 I borrowed some money from Mr. Polk and came down here and paid the taxes down here." But it is undisputed by the testimony of any other witness and is corroborated to some extent by the fact that Mr. Polk testified that after he bought the land at the tax sale Levi Walker "owed me a store account and I told him that if he would pay me the store account and pay taxes that he could have it," and also by the further fact that Levi Walker thereafter paid in April, 1931, the taxes on the land for the year 1930, and in April, 1932, the taxes thereon for the year 1931, as clearly shown by his undisputed testimony and by the duplicate tax receipts for those two years. If he had not paid the taxes on April 7, 1930, before the land was sold for taxes that day, it would seem unlikely that on April 30, 1932, he would have paid the taxes on the land for the year 1931, after the two years allowed for redeeming from the tax sale of April 7, 1930, had expired, and without his having made any effort to redeem same.

On October 7, 1933, the land was sold to the state for the taxes for the year 1932, while assessed to Lampton and Rawls, and was redeemed by the complainant R. E. L. Polk, on September 3, 1936. In 1933, it was assessed to Lampton and Rawls Company and was sold to the state for the taxes of said year, and was thereafter redeemed by R. E. L. Polk, on September 3, 1936. In 1934 it was assessed to Lampton and Rawls Company, sold to the state, and thereafter redeemed by R. E. L. Polk on September 3, 1936. In 1935, it was assessed to R. E. L. Polk and he paid the taxes thereon on December 30, 1935. It was again assessed to Lampton and Rawls in 1936 and 1937, and the tax receipts for said years were duly issued in the name of Lampton and Rawls, as shown by the duplicate tax receipts introduced by the complainants. In 1938 it was assessed to Lampton and Rawls,

sold to Mrs. R. J. Morehead October 23, 1939, and redeemed by Mr. Polk September 21, 1940. In 1939, it was assessed to Lampton and Rawls, sold to Mrs. R. L. Moorhead on September 16, 1940, and was redeemed by Mr. Polk on September 30, 1940. It then appears that beginning with the year 1940, during which year the land was leased for oil and gas, the same was thereafter duly assessed to the complainant Polk and that he kept the taxes duly paid without any default after that time. In fact, he testified that he paid the taxes, either by redeeming the land or otherwise, for each of the years following the payment made by Levi Walker on April 30, 1932, for the 1931 taxes.

Levi Walker did not repay to Lampton and Rawls Company the $19.94 paid by said Company for him on April 1, 1929, for the 1928 taxes, but it does not appear from the record that he knew that the land was on that same day sold to the said Company by V. L. Terrell, Sheriff and Tax Collector, as shown by the tax deed introduced in evidence by the complainants, which tax deed the trial court did not adjudicate to be valid by its decree and evidently for the reason that the Sheriff and Tax Collector was without authority to sell the land to Lampton and Rawls after the said Company had paid the taxes to him on behalf of Levi Walker, on the date of the sale, as shown by the duplicate tax receipt in his office.

However, the principal issue to be determined on this appeal is whether or not the prima facie presumption of the nonpayment of the taxes that may arise from the execution and delivery of the tax deed to the complainant R. E. L. Polk, and from the other documentary evidence relied upon by the complainants, is overcome by the undisputed facts hereinbefore mentioned. In other words, we are called on to determine the sufficiency of evidence, both oral and documentary, to show that the taxes for 1929 were paid by the appellant, Levi Walker, and we are not asked to reverse the trial court on conflicting evidence on that issue; that is to say, there is no

conflict in the oral testimony in that regard, and the question is as to whether Levi Walker is contradicted by the *documentary* evidence.

We are of the opinion that in the absence of any explanation by the Sheriff and Tax Collector, V. L. Terrell, as to what became of the original tax receipt when he signed the duplicate showing that he had received from Levi Walker the taxes on this land, for the year 1929, or of any denial by him that the taxes were paid and the sale was an error, the undisputed testimony of the said Walker that, ''In 1930 I borrowed some money from Mr. Polk and came down here and paid the taxes down here'' cannot be rejected since it is not manifestly unreasonable or unbelievable, and especially in view of the fact that he is corroborated by the duplicate tax receipt as originally filled out and signed and preserved as a public record as required by the statute, and by the further fact that on April 6, 1931, Walker admittedly paid the taxes for 1930 and again on April 30, 1932, paid the taxes for the year 1931, after the two years for redeeming the land from the sale on April 7, 1930, had expired.

Then, too, the said Sheriff and Tax Collector should have been able to explain, if he had been introduced as a witness, as to whether or not, or why, he signed the duplicate tax receipt, presumably by the use of carbon paper at the time he signed the original, and left the duplicate in his tax receipt book, unless the taxes had been paid according to the recitals thereof. This officer should have been able to further explain whether or not he may have overlooked marking this land off of his newspaper advertisement of the tax sales for that year before going to the front door of the court house and selling the lands described in such advertisement, including the land in question. It was incumbent upon the complainants to meet the issue of fact raised by the testimony of the alleged taxpayer as to his payment of the taxes, and the presumption that arose from the fact that the signed duplicate tax receipt so disclosed, since the tax

deed was only prima-facie evidence that this land had been validly assessed and sold for taxes.

Moreover, the appellant R. E. L. Polk should have been able to testify as to whether or not he let the alleged taxpayer Levi Walker have the money in 1930 with which to pay any taxes on said land. As hereinbefore shown, if he borrowed any money and paid any taxes in 1930, it was necessarily the taxes for 1929, since the taxes for 1928 were shown to have been paid on April 1, 1929, according to duplicate tax receipt #4155, and were paid for the year 1930 by Levi Walker on April 6, 1931, according to duplicate tax receipt #4463, and were paid for the year 1931 by Levi Walker on April 30, 1932, according to duplicate tax receipt #4788.

It is true that the testimony of Levi Walker quoted in paragraph 8 of this opinion does not disclose that he was specifically asked about whether or not he paid the taxes on the land for the year *1929*, but it does disclose that he said: "In 1930 I borrowed some money from Mr. Polk and came down here and paid the taxes down here." While it is also true that Levi Walker testified that "I paid the taxes two years myself", the remainder of this concluding answer of the testimony quoted in paragraph 8 discloses that he manifestly meant when he said "I paid the taxes two years myself" that he paid them for the years 1930 and 1931 from his own resources, and that he borrowed some money in 1930 from Mr. Polk and came and paid the taxes, and that he meant thereby for the year 1929 as aforesaid.

We do not feel justified in rejecting this undisputed testimony under the facts and circumstances hereinbefore stated in this opinion. If it were a question of reversing the decision of the chancellor on conflicting evidence on this issue, we would not be willing to do so.

This brings us to the necessity of passing on the sufficiency of the testimony to sustain the plea of ten years' adverse possession under either Section 709 or 711, Code of 1942. It is now well settled that in the applica-

tion of Section 709 the mere lapse of time does not suffice, but the possession relied upon by a claimant of land must exist to support the plea of limitation under that statute the same as if he were claiming the land under and by virtue of possession held under Section 711, Code of 1942. Hooper v. Walker et al., 201 Miss. 158, 29 So. (2d) 72.

The general rule is to the effect that a tax deed gives color of title although it is invalid or even where absolutely void, providing the description of the property is legally sufficient. Hanna v. Renfro, 32 Miss. 125; Hamner et al. v. Yazoo Delta Lumber Co., 100 Miss. 349, 56 So. 466; Shepherd v. Cox et al., 191 Miss. 715, 1 So. (2d) 495, 4 So. (2d) 217, 136 A. L. R. 1346; 2 C. J., Sections 362 and 364, pages 188 and 189; 2 C. J. S., Adverse Possession, Section 72.

We shall therefore consider the question of the sufficiency of the proof of adverse possession relied upon in the instant case upon the theory that the cultivation and continuous possession of a part of the tract of land for ten years will extend the possession to the entire calls of the tax deed.

The facts on the issue now under consideration are that the tax title purchaser R. E. L. Polk rented the land to Lefty Gray, Jr., for the years 1935 and 1936, and that Gray cultivated some small patches of open land, aggregating approximately 4 acres, near the edges of the 40 acres, and was assisted in such efforts by his brother, Louis Gray; that he then rented these patches to the said Louis Gray for the years 1937 and 1938 and that he cultivated the same area of land; that Louis Gray was succeeded by A. L. Dampeer as a tenant of Mr. Polk, but the witnesses were not certain as to what year Dampeer rented the land, except that his father, Plato Dampeer, testified that A. L. Dampeer went on the land in 1943, and that he cultivated it for two years, saying that ''I remember that it was in 1943'', and when asked: ''Did he just rent it for the year, in 1943, or did he rent it 1, 2,

3 or more years? How long did he rent it? A. Yes, sir, 1 year.

"Q. He just rented it for 1 year? A. Yes, sir.

"Q. Did he follow the Gray boys? A. At one time I think.

"Q. At one time? A. Yes, sir.

"Q. When he had it, did he have it years together, or separate? A. Separate, I think; that Charlie Thompson rented it one year as a tenant of Mr. Polk, which was in 1944, and the witness, Plato Dampeer, thought that his son, A. L. Dampeer, who was not present to testify, followed Charlie Thompson one of the years that A. L. Dampeer cultivated the land; that Givens Draughn plowed it up in 1945, but did not make a crop, and harvested two loads of hay therefrom; that it is uncertain as to whether anyone used the land in 1946; that Louis Gray resumed the use of the land as a tenant of Mr. Polk in 1947, plowed it up but was unable to obtain any fertilizer that year and did not make a crop; and that Louis Gray used the small patches of open land again in 1948."

The interpretation given in their brief by counsel for the appellees of the testimony on the issue of adverse possession is as follows: "It will be noted from the above summaries (after having summarized all of the material testimony on this issue) that the land was farmed by tenants of Mr. R. E. L. Polk each and every year from 1935 to 1948, *with the exception of the period from 1938 to1943 and possibly 1946.*" (Italics supplied). They urge, however, that temporary changes in the possession of land by the removal of one tenant therefrom and the entry of another will not break the continuity of adverse possession, and they cite in support thereof the case of Douglas et al. v. Skelly Oil Co. et al., 201 Miss. 23, 28 So. (2d) 227, on the question of the changing of tenants. However, in that case the Court merely held that temporary changes in actual occupancy of land between time of removal of one tenant therefrom and entry of an-

other, and the failure to make a crop thereon, would not break the continuity of adverse possession, particularly where there was ten years' continuous adverse possession after such interruptions. Such is not true in the case at bar.

The burden of proof rested upon the complainants to establish their plea of ten years' adverse possession, and the testimony in this case is too uncertain and indefinite to meet such burden. No use was made of the land during any year after the tax sale except to cultivate the small patches of open land hereinbefore mentioned. There was no fence, house or other improvements on the land at the time during the period relied on. There was therefore no actual occupancy of the land by anyone. No use was made of it except from about the month of March until or through the month of September of the years during which these tenants who lived some distance away had cultivated these small areas mentioned. No timber or pulpwood was sold from the land although there was some that could have been sold, and there was no effort to clear up and use such additional portions of the tract as could have been cultivated according to the testimony of some of the witnesses introduced by the complainants, the tax-title purchaser having testified that he just let the tenants use what they wanted and he didn't specify what they could use. It may be added, however, that the tax-title purchaser did lease the land for oil and gas on August 31, 1940, and that he collected the annual rental of $1.00 per acre thereon from that time until the trial of the cause. It is also true that his claim to the land was open and notorious in the community, but his use of the same, under the circumstances hereinbefore shown, was not continuous for the statutory period required.

Whatever delay there was in the defendants' reassertion of their claim to the land has not worked an estoppel, because the tax-title purchaser has built no improvements on the land, or made any other expendi-

tures in connection therewith or otherwise changed his position, except for taxes paid subsequent to the sale and the amount thus paid out is offset by the sums received as a cash consideration for the oil and gas lease, and in the annual rentals of $1.00 per acre accruing since the execution of such lease in 1940, together with the meager rents paid by the tenants for the use of some of the land.

In response to the claim that the defendants had moved away and abandoned the land, it is sufficient to say that it is admitted that the same was owned in fee simple by Celia Walker at the time of the tax sale, and that the defendants are her sole surviving heirs at law, and it should therefore be noted that in the case of Meyerkort v. Warrington, Miss., 19 So. (2d) 433, 435, this Court held: ''In this State the common-law rule prevails that save as to easements, or licenses or mere equities, abandonment is not effective to divest the title to real estate, and that as to fee simple titles, these are lost only by estoppel or by adverse possession, or by maintainable tax sale.'' It is true that the opinion in this case was withdrawn during the pendency of a suggestion of error thereon, and after the parties thereto had settled the controversy among themselves. Meyerkort v. Warrington, 198 Miss. 29, 20 So. (2d) 708. Nevertheless, the Court had decided the issues presented on the appeal and still adheres to the principle of law above quoted.

Being of the opinion that the complainants were not entitled to have their title quieted and confirmed, either on the alleged validity of the tax sale, or on the basis of their claim of adverse possession, we do not reach a discussion of any of the other questions presented by the appeal.

The case has presented considerable difficulty and has been thoroughly discussed in the conferences of the judges thereon, but due to the lack of evidence to overcome the oral and documentary proof relied upon by the defendants to show that the taxes were not delinquent at

the time of the sale, and the failure of the proof to show ten years' continuous possession thereafter, we are unable to uphold the validity of the tax sale, or to affirm the decree appealed from on the claim of adverse possession by the complainants. The decree must, therefore, be reversed and the bill of complaint dismissed, there being no affirmative relief sought by the defendants, which would have required a tender by them of the taxes paid by the complainant Polk after the alleged tax sale, and there being no claim for an accounting as to the meager rents received from the land and all profits that may have been derived by him from the oil and gas lease.

Reversed and dismissed.

**Alexander, J.** (specially concurring).

I am not unwilling to concur in the findings of fact under which the signature of an ambiguous tax receipt was challenged by the production of a tax deed, supported by the roll and lists showing that the land was sold to Polk for the taxes of 1929. I am somewhat anxious, however, lest the prima facie validity supplied by a tax deed may have suffered some impairment at our hands. I have been unable to find that the error by the tax collector respecting this land the previous year is of probative force to support the fact of a similar error the following year. The so-called tax receipt is self-contradicting since it indicates both that the taxes were paid, and also that the land was sold for nonpayment thereof. The latter interpretation is supported by the tax rolls and the lists of lands sold. The solution of this dilemma as an issue of fact may be justified. My chief concern, however, is only to preserve the efficacy of a tax deed to shift a substantial burden of proof onto the shoulders of a former owner.

**Roberds, J.**, concurs in the above opinion.